IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CV3076 |
| | ) | |
| v. | ) | |
| | ) | |
| L.B. FOSTER COMPANY, | ) | MEMORANDUM AND ORDER ON |
| | ) | DEFENDANT'S MOTION FOR |
| Defendant. | ) | SUMMARY JUDGMENT |
| | ) | |

The plaintiff, BNSF Railway Company (BNSF), filed a six-count amended complaint against the defendant, L.B. Foster Company (L.B. Foster), on August 5, 2011.  (ECF No. 15.)  Now before me is L.B. Foster's motion for summary judgment.  (ECF No. 43.)  For the following reasons, I find that L.B. Foster's motion must be granted.

## I.   BACKGROUND[1]

BNSF is a Delaware corporation.  (Def.'s Statement of Material Facts (Def.'s Facts) ¶ 11, ECF No. 45.)  Though its principal place of business is located in Fort Worth, Texas, (see id.), it is registered and authorized to do business in Nebraska, (Pl.'s Statement of Additional Material Facts (Pl.'s Facts) ¶ 15, ECF No. 54).  Indeed, BNSF has conducted a substantial amount of its business in Nebraska since its formation.  (See Pl.'s Facts ¶¶ 17-22.)  L.B. Foster is a Pennsylvania Corporation that is registered and authorized to do business in Nebraska.  (Def.'s Facts ¶ 12; Pl.'s Facts ¶ 1.)

On or about June 19, 2002, Darrell Leibhart, a Roadmaster for BNSF's Butte Subdivision, ordered a 132-pound bonded insulated rail joint (the insulated joint) from L.B. Foster.  (Pl.'s Facts

---

[1] The facts summarized below are taken from the statements of material facts set forth in the parties' briefs.  (See Def.'s Br. at 1-2, ECF No. 45; Pl.'s Br. at 1-8, ECF No. 54; Pl.'s Supp. Br. at 2-4, ECF No. 97.)  Facts that are not listed in the statements of facts in accordance with ths court's local rules may be disregarded.

¶¶ 6-7; Pl.'s Index, Ex. 6, Liebhart Aff. ¶¶ 6-7 & Exs. 6A-6B, ECF No. 55-6.)  The insulated joint was manufactured in Indiana by L.B. Foster's subcontractor, Midwest Rails, Inc., (Def.'s Facts ¶ 10), and shipped to BNSF in Crawford, Nebraska, (Pl.'s Index, Ex. 6, Liebhart Aff. Ex. 6A, ECF No. 55-6).  On or about June 11, 2003, the insulated joint was installed on BNSF's railroad track near Ardmore, South Dakota.  (Pl.'s Index, Ex. 6, Liebhart Aff. ¶ 6; Def.'s Facts ¶ 1.)

According to L.B. Foster, the sale of this insulated joint was "governed" by an agreement between L.B. Foster and BNSF dated April 1, 1998 (the Agreement).  (Def.'s Facts ¶¶ 4-6, 8.)  The Agreement states that it became effective on April 1, 1998, and would "continue in force until March 31, 2001, unless terminated by either party" in accordance with the Agreement's terms.  (Def.'s Index, Ex. 2, Shue Aff. Ex. 2A at 5, ECF No. 44-3.)  It also states, "This Agreement shall be governed by the laws of the State of Kansas."  (Id. at 6.)  There is no evidence, however, that BNSF ever signed the Agreement.  (See id. at 8.  See also Pl.'s Index, McKee Aff. ¶¶ 6, ECF No. 55-7.)  Moreover, the order for the insulated joint was placed beyond the effective term of the Agreement.  Although BNSF and L.B. Foster did enter into an "Agreement for Purchase of Insulated Joints" on November 1, 2003, it appears there was no signed written agreement between the parties in effect between March 1, 2001, and November 1, 2003, pertaining to the sale of insulated joints.  (See Pl.'s Index, McKee Aff. ¶¶ 5, 7, 13-21, ECF No. 55-7.)

On or about January 22, 2008, a BNSF train departed from Edgemont, South Dakota, and derailed while passing over the insulated joint on the track near Ardmore, South Dakota.  (Def.'s Facts ¶ 2.)  At the time of the derailment, the train was bound for Alliance, Nebraska.  (Pl.'s Facts ¶ 12.)  Kenneth Willey, who has served as BNSF's Trainmaster for the Butte Subdivision since 2007, states that as far as he is aware, "no South Dakota residents were personally injured in the derailment, and no South Dakota residents suffered any property losses."  (Pl.'s Index, Ex. 8, Willey Aff. ¶ 10, ECF No. 55-8.)  He adds, "No injuries or property damage to South Dakota residents or businesses were reported to BNSF as a result of the derailment at issue.  There were no service interruptions to local South Dakota businesses caused by the derailment on my section of track (because there are no businesses in this area to be affected)."  (Id.)

BNSF filed a complaint against L.B. Foster on May 19, 2011, (ECF No. 1), and, as noted above, it filed a six-count amended complaint on August 5, 2011, (ECF No. 15).  In its amended

2

complaint, BNSF alleges that its post-accident investigation revealed defects in the insulated joint that could not have been reasonably discovered by BNSF prior to the derailment.  (Id. ¶ 14.)  BNSF adds, "As a proximate result of the failure of the defective insulated joint and the aforementioned derailment, BNSF has incurred damages to its property, including its rolling stock, vehicles and equipment, to its locomotives, railcars, lading, signal equipment, rails, ties, and other track structures, and BNSF has suffered business interruption costs, including without limitation, train delay and train crew charges, all at a cost to BNSF in excess of One Million Dollars . . . ." (Id. ¶ 15.)  It also alleges, "BNSF's operations in Nebraska were directly impacted by the derailment.  BNSF employees from Nebraska provided the labor and material related to the post-derailment cleanup effort.  Consequently, all of the costs associated with the cleanup, which totaled approximately $110,000, were charged to BNSF facilities in Nebraska." (Id. ¶ 16.)

In Count I, which is titled "Negligence," BNSF alleges that L.B. Foster "was negligent in failing to ensure that the insulated joint was safe for the use for which it was manufactured, assembled, supplied, distributed, sold or otherwise placed into interstate commerce[,] and [L.B.] Foster breached its duty of reasonable care owed to BNSF by failing to properly and adequately research, develop, design, test, manufacture, assemble, inspect, specify, instruct, advise, warrant, warn, maintain, recall and correct defects in the insulated joint."  (Id. ¶ 18.)

In Count II, which is titled "Negligent Misrepresentation," BNSF alleges that L.B. Foster "failed to exercise reasonable care or competence in obtaining, managing and communicating accurate and truthful information related to its insulated joints and thereby misrepresented facts concerning their use, quality, specifications and performance characteristics" "for the purpose of inducing NBSF to rely upon said misrepresentations and purchase insulated joints." (Id. ¶¶ 22-23.)  It adds that "BNSF reasonably and justifiably relied upon the facts misrepresented by [L.B.] Foster related to the insulated joint and purchased a defective insulated joint to its ultimate detriment." (Id. ¶ 24.)   BNSF also claims that the derailment "was a direct and proximate result of said misrepresentations of facts by [L.B.] Foster." (Id.)

In Count III, which is titled "Strict Liability," BNSF alleges that when L.B. Foster "sold the insulated joint to BNSF, the insulated joint was in a defective condition, unreasonably dangerous to BNSF's personnel, property and premises when put to its intended use[,] and [L.B.] Foster knew or

in the exercise of reasonable care should have known that the insulated joint would be used by BNSF without an inspection for such latent defects." (Id. ¶ 27.)  BNSF also alleges that the defective insulated joint reached "BNSF without substantial change in the condition in which it was when it was supplied, distributed or otherwise placed in interstate commerce," and that "BNSF used the insulated joint in a manner reasonably anticipated by [L.B.] Foster and for the general purpose for which it was designed, manufactured, and sold." (Id. ¶¶ 28.)  It adds, "As a result of said defective condition, the insulated joint failed[,] resulting in the derailment . . . ." (Id. ¶ 30.)

In Count IV, which is titled "Breach of Express Warranties," BNSF alleges that in connection with the sale of the insulated joint, L.B. Foster "expressly warranted through affirmations of fact, promises and/or descriptions that the insulated joint was designed, developed, and manufactured in accordance with AREMA [American Railway Engineering & Maintenance-of-Way Association] and BNSF specifications and in strict compliance with all applicable portions of the ISO." (Id. ¶ 34.)[2] L.B. Foster also "warranted that the insulated joint would remain free from defects for the life of BNSF's track or at least 10 years." (Id.)  BNSF adds that it "reasonably and justifiably relied on" these warranties, but the insulated joint that it purchased "did not conform to the . . . warranties." (Id. ¶¶ 35-36.)  It alleges further that L.B. Foster's breach of the warranties proximately caused "the derailment and the consequent damages incurred by BNSF." (Id. ¶ 37.)

In Count V, which is titled "Fraudulent Misrepresentation," BNSF alleges that "[p]rior to selling the insulated joint at issue, [L.B.] Foster represented to BNSF that the insulated joint was compliant with all AREMA and BNSF specifications and that it was designed, developed, and manufactured in accordance with all applicable portions of the ISO," but "[e]ach of these representations was false and [L.B.] Foster knew they were false at the time it made [them]." (Id.

---

[2] The amended complaint includes the following allegation: "[L.B.] Foster further warranted that its insulated joints were designed, developed, and manufactured in accordance [with] the specific standards and requirements if ISO 9001:2000 ("ISO"), which is a quality management system established and developed by the International Organization for Standardization. . . .  By warranting itself as an ISO certified manufacturer of insulated joints, ISO [sic] expressly warranted, among other things, that its insulated joints would meet BNSF's expectations with respect to longevity, specifically, that the rail joints would last at least ten years." (Am. Compl. ¶ 9, ECF No. 15.)

4

¶¶ 40-41.)  BNSF also alleges that the damages associated with the derailment were proximately caused by its reliance on Foster's misrepresentations.  (Id. ¶ 44.)

Finally, in Count VI, which is titled "Fraudulent Concealment," BNSF alleges that L.B. Foster "had a duty to BNSF to disclose that the insulated joint at issue was not compliant with all AREMA and BNSF specifications and that it was not designed, developed, and manufactured in accordance with all applicable portions of the ISO," but L.B. Foster "fraudulently concealed this fact from BNSF" "with the intention that BNSF purchase the insulated joint for use on its rail."  (Id. ¶¶ 46, 48.)  BNSF also alleges that it relied on L.B. Foster's "representations concerning the quality and characteristics of the insulated joint," had no way of discovering the insulated joint's defects "upon a reasonable external examination," and suffered derailment-related damages due to its purchase of the insulated joint.  (Id. ¶¶ 47, 49-50.)

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  See also Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, Anderson, 477 U.S. at 249.

It is the moving party's burden to establish that no genuine issue of material fact exists.  Fed. R. Civ. P. 56(a); Adickes, 398 U.S. at 157.  Therefore, if the moving party does not meet its initial burden, summary judgment must be denied even if no affidavits or other evidence have been submitted in opposition to the motion.  See Adickes, 398 U.S. at 159-60.  After the moving party has met its burden, however, "the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 890 (8th Cir. 2005).

## III.   ANALYSIS

L.B. Foster has moved for summary judgment, arguing that "the applicable statute of limitations bars [BNSF's] claims." (Def.'s Br. at 1, ECF No. 45.) According to L.B. Foster, either Kansas's or South Dakota's statute of limitations applies to BNSF's claims, and BNSF's original complaint was not filed timely under either state's laws. (Id. at 4-13.) In response, BNSF argues that Nebraska's statute of limitations applies, or, in the alternative, that certain claims were timely filed under South Dakota law. (See Pl.'s Br. at 13-42, ECF No. 54.)

### A.   Whether Kansas's Statute of Limitations Applies

L.B. Foster argues that BNSF's claims are untimely because the parties' entered into an Agreement governed by Kansas law, and Kansas law states that product liability claims are subject to a two-year statute of limitations. (See Def.'s Br. at 12-13 (citing, inter alia, Fennesy v. LBI Management, Inc., 847 P.2d 1350, 1354-55 (Kan. Ct. App. 1993); Kan. Stat. Ann. § 60-513).) See also Kan. Stat. Ann. § 60-3302(c) (defining "product liability claim" as including any action based on "strict liability in tort, negligence, breach of express or implied warranty, breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent, misrepresentation, concealment or nondisclosure, whether negligent or innocent, or under any other substantive legal theory"). The copy of the Agreement in the summary judgment record is not signed by BNSF, however, and BNSF purchased the insulated joint after the Agreement's effective term had lapsed. Thus, there is a genuine issue as to whether the Agreement applies, and I cannot grant L.B. Foster's motion for summary judgment insofar as it depends on a finding that Kansas's two-year statute of limitations is controlling.

### B.   Whether South Dakota's or Nebraska's Substantive Law Applies

L.B. Foster also argues that South Dakota's statute of limitations governs BNSF's claims; that the applicable statute of limitations is three years; and that BNSF's claims must be dismissed because more than three years elapsed between the January 22, 2008, derailment and the filing of the original complaint on May 19, 2011. (See Def.'s Br. at 4-12, ECF No. 45.) As noted previously, BNSF maintains that its claims are governed by Nebraska's statute of limitations, and it argues that some of its claims are timely even if South Dakota's statute of limitations applies. (Pl.'s Br. at 13-42, ECF No. 54.)

6

I must decide whether South Dakota's or Nebraska's statute of limitations applies to BNSF's claims. The parties agree that Nebraska's choice-of-law rules govern my analysis. (See Def.'s Br. at 6-7, ECF No. 45; Pl.'s Br. at 14, ECF No. 54.) See also Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH, 495 F.3d 582, 584 (8th Cir. 2007) ("In general, the district court must apply the choice-of-law rules of the forum state." (quoting Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1028 (8th Cir. 2003)) (internal quotation marks and alteration brackets omitted)); John T. Jones Construction Co. v. Hoot General Construction Co., Inc., 613 F.3d 778, 782 (8th Cir. 2010) ("We apply the choice-of-law rules of the forum state in a diversity action.").

The Nebraska Supreme Court instructs that "before entangling itself in messy issues of conflict of laws, a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." American National Bank v. Medved, 801 N.W.2d 230, 238 (Neb. 2011) (footnote omitted). "An actual conflict exists when a legal issue is resolved differently under the law of two states." Id. (footnote omitted). Thus, I shall determine first whether BNSF's claims would be subject to different limitations periods in South Dakota or Nebraska.[3]

South Dakota Codified Laws section 15-2-12.2 states,

> An action against a manufacturer, lessor, or seller of a product, regardless of the substantive legal theory upon which the action is brought, for or on account of . . . property damage caused by or resulting from the manufacture, construction, design, formula, installation, inspection, preparation, assembly, testing, packaging, labeling, or sale of any product or failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product may be commenced only within three

---

[3] It merits mention that "Nebraska courts generally must apply the limitation period contained in the law of the state upon which a claim is substantively based." Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH, 495 F.3d 582, 584 n.1 (8th Cir. 2007) (citing Neb. Rev. Stat. § 25-3203). In other words, the applicable statute of limitations is not necessarily that of the forum state (i.e., Nebraska); rather, it depends on which state's substantive law is deemed applicable. Under the circumstances, it seems to me that it is appropriate to focus on the differences between Nebraska's and South Dakota's statutes of limitations to determine whether a choice-of-law analysis is necessary. Moreover, to the extent that BNSF implies that the statutes of limitations are not matters of substantive law, its arguments are rejected. (See, e.g., Pl.'s Br. at 18, 35, ECF No. 54.)

7

years of the date when the . . . property damage occurred, became known or should have become known to the injured party.

BNSF's action is against a seller of insulated joints "for or on account of . . . property damage caused by or resulting from the manufacture, construction, design, . . . inspection, . . . assembly, testing, . . . or sale of" an insulated joint, or a "failure to warn . . . against a danger or hazard in the use" of an insulated joint," "or the failure to provide proper instructions for the use of" an insulated joint. See id. (See also Am. Compl. ¶¶ 8, 18-20, 22, 24-25, 27, 30-31, 33-35, 37, 40-41, 43-44, 46-50, ECF No. 15.)  Therefore, I agree with L.B. Foster that if South Dakota law governs this case, BNSF's product liability action is subject to the three-year limitations period specified in section 15-2-12.2.  (See Def.'s Br. at 12, ECF No. 45.)

In contrast, product liability actions[4] in Nebraska are subject to a four-year statute of limitations and, in some instances, a statute of repose.  Specifically, Revised Statutes of Nebraska section 25-224 states,

(1) All product liability actions [with an exception not relevant here] shall be commenced within four years next after the date on which the death, injury, or damage complained of occurs.

(2)(a) Notwithstanding subsection (1) of this section or any other statutory provision to the contrary, any product liability action, except one governed by section 2-725, Uniform Commercial Code or [by a subsection not relevant here], shall be commenced as follows:

(i) For products manufactured in Nebraska, within ten years after the date the product which allegedly caused the personal injury, death, or damage was first sold or leased for use or consumption; or

(ii) For products manufactured outside Nebraska, within the time allowed by the applicable statute of repose, if any, of the state or county where the product was manufactured, but in no event less than ten years.  If the state or country where the

---

[4] Nebraska law defines "product liability action" as "any action brought against a manufacturer, seller, or lessor of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of . . . property damage caused by or resulting from the manufacture, construction, design, formulation, installation, preparation, assembly, testing, packaging, or labeling of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or intended use of any product, or the failure to provide proper instructions for the use of any product."  Neb. Rev. Stat. § 25-21,180.

product was manufactured does not have an applicable statute of repose, then the only limitation upon the commencement of an action for product liability shall be as set forth in subsection (1) of this section.

In the instant case, the difference in the states' laws is significant. The record indicates that the insulated joint at issue was sold to BNSF in approximately June 2002; the derailment occurred on January 22, 2008; and BNSF's original complaint was filed on May 19, 2011. Thus, the complaint was filed timely if Nebraska's statute controls,[5] but it was not filed timely under South Dakota law.[6] Under the circumstances, a choice-of-law analysis must be undertaken to determine which state's statute of limitations governs BNSF's action.[7]

I note in passing that there are two exceptions to the Nebraska rule that a claim based on another state's substantive law will be governed by that state's statute of limitations. See Neb. Rev. Stat. §§ 25-3203, 25-3205. See also John P. Lenich, Nebraska Civil Procedure § 5:33 (2012). BNSF has not argued that either exception is applicable in this case, however. (See generally Pl.'s Br., ECF No. 54.) Therefore, I shall proceed to determine whether the substantive law of South Dakota or Nebraska applies to BNSF's action; then I must apply that state's statute of limitations.

Because different choice-of-law methods apply to different types of actions, I must categorize BNSF's action. See Johnson v. United States Fidelity and Guaranty Co., 696 N.W.2d 431, 437 (Neb. 2005) (explaining that because the type of action brought by a plaintiff "can involve both tort and contract liability," a court must "classify the nature of the specific conflict issue: Does the conflict sound in tort or in contract?"). L.B. Foster argues that BNSF has brought a product liability action, and therefore I should conduct a single choice-of-law analysis based on the general method that is applied in tort cases. (See Def.'s Br. at 6-11, ECF No. 45.) In contrast, BNSF argues

---

[5] More specifically, the complaint was filed within four years of the date of the derailment, and even if the statute of repose applies, the complaint was filed within ten years of the date of the sale of the insulated joint.

[6] The original complaint was not filed within three years of the date of the derailment.

[7] I note in passing that L.B. Foster argues that there are other relevant, substantive differences between Nebraska and South Dakota law that call for a choice-of-law analysis. (See Def.'s Reply Br. at 7-8, ECF No. 56.) Because I find that the differences in the states' statutes of limitations demand a choice-of-law analysis, I express no opinion about the significance of any other potential differences.

9

that because its six causes of action can be classified as tort, contract, fraud, or misrepresentation actions, I should conduct separate choice-of-law analyses for each of the amended complaint's six counts.  (Pl.'s Br. at 13-39, ECF No. 54.)

I find that under Nebraska law, BNSF's six causes of action are all essentially "product liability actions" as that term is defined in Revised Statutes of Nebraska section 25-21,180.  As noted previously, section 25-21,180 defines "product liability action" as "any action brought against a . . . seller . . . of a product, <u>regardless of the substantive legal theory or theories upon which the action is brought</u>, for or on account of . . . property damage caused by or resulting from the manufacture, construction, design, formulation, installation, preparation, assembly, testing, packaging, or labeling of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or intended use of any product, or the failure to provide proper instructions for the use of any product."  (Emphasis added).  L.B. Foster is a seller of insulated joints, and every one of BNSF's causes of action is brought "for or on account of . . . property damage caused by or resulting from" the allegedly defective insulated joint that was sold by L.B. Foster and installed on the track near Ardmore, South Dakota..  Thus, the action falls squarely within the definition of a product liability action.

It is true that BNSF has designated six separate counts in its amended complaint as negligence, negligent misrepresentation, strict liability, breach of express warranties, fraudulent misrepresentation, and fraudulent concealment claims.  But the characterization of an action is "determined by the nature of the complaint, not by the form of the pleadings, and consideration must be given to the facts which constitute the cause of action."  <u>Thomas v. Countryside of Hastings, Inc.</u>, 524 N.W.2d 311, 313 (Neb. 1994).  <u>See also</u> <u>St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co.</u>, 507 N.W.2d 275, 284 (Neb. 1993) (noting that "a cause of action consists of the fact or facts which give one a right to judicial relief against another," and "a theory of recovery is not itself a cause of action").  There is no dispute that BNSF's negligence and strict liability claims are part of a product liability action; BNSF concedes that the statutes of limitations for product liability actions apply to these claims.  (Pl.'s Br. at 19, 35, ECF No. 54.)   After carefully analyzing BNSF's general allegations, the specific allegations supporting its claims for breach of warranty, negligent and fraudulent misrepresentation, and fraudulent concealment, and the evidence submitted in connection

10

with L.B. Foster's motion for summary judgment, I am satisfied that each of BNSF's remaining theories of liability merely reframes its product liability action. For example, though BNSF's breach of warranty claim is framed as an attempt to enforce a promise breached by L.B. Foster, it ultimately represents an attempt to hold L.B. Foster liable for the property damages caused by the derailment. (See Am. Compl. ¶¶ 32-38, ECF No. 15.) See also Groth v. Sandoz, Inc., 601 F. Supp. 453 (D. Neb. 1984) (holding that under Nebraska law, causes of action designated as negligence, strict liability, and warranty were "in the nature of product liability actions"). Similarly, BNSF's negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims are all based on allegations that L.B. Foster failed to make truthful statements (or made untruthful statements) about the manufacture, construction, and design of the insulated joint, but these alleged misrepresentations cannot be severed from the failure of the insulated joint and the derailment it caused. Cf. Groth, 601 F. Supp. at 456 ("[P]laintiff's 'fraud' cause of action is unsupported in the record by any specific allegations of fraudulent conduct and is substantively nothing more than a restatement of plaintiff's strict liability, negligence and breach of warranty causes of action grounded in product liability."). Each of the plaintiff's claims arises from "property damage caused by or resulting from the manufacture, construction, design, formulation, installation, preparation, assembly, testing," etc., of the insulated rail joint that failed. Neb. Rev. Stat. § 25-21,180. Thus, this is a product liability action. Therefore, I shall not separate the various theories of recovery for the purposes of conducting separate choice-of-law analyses or applying different statutes of limitations. Cf. Fields v. Wyeth, Inc., 613 F. Supp. 2d 1056, 1059 (W.D. Ark. 2009) (concluding that plaintiff's claims for personal injury based on theories of strict liability, negligence, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and breach of implied warranty were a "product liability action" as defined in Arkansas, which has a statute similar to Nebraska's).

I must now use Nebraska's choice-of-law rules to determine whether the substantive law of Nebraska or South Dakota governs BNSF's cause of action. Nebraska courts seek guidance from the Restatement (Second) of Conflict of Laws when making choice-of-law determinations. See Erickson v. U-Haul International, 767 N.W.2d 765, 772 (Neb. 2009). "Under the Restatement, the 'most significant relationship' test is used to determine the applicable law for specific tort claim issues." Id. at 772-73. See also Restatement (Second) of Conflict of Laws § 145(1) ("The rights and

11

liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."). "Section 145(2) of the Restatement provides the contacts that a court should consider when determining which state has the most significant relationship to the parties and the occurrence under general conflict-of-law principles." Erickson, 767 N.W.2d at 773. These contacts are "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2). Section 147 of the Restatement provides, however, that "the local law of the state where the injury occurred determines the rights and liabilities of the parties" in cases of injury to "tangible things," unless "some other state has a more significant relationship under the principles stated in § 6 to the occurrence, the thing and the parties." See also Restatement (Second) of Conflict of Laws § 145, comment e ("In the case of . . . . injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law . . . . This is so for the reason among others that persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury.").

The "general conflict-of-law principles" set forth in § 6 state that in the absence of a statutory directive, "the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6.

This case involves injuries to tangible things, and the injuries occurred in South Dakota. Therefore, in accordance with § 147, the law of South Dakota "determines the rights and liabilities of the parties," unless Nebraska "has a more significant relationship . . . to the occurrence, the thing and the parties." After careful consideration of all of the relevant factors set forth in § 6(2) and §

12

145(2) of the Restatement, I must reject BNSF's argument that Nebraska has a more significant relationship to the parties and to the derailment. I conclude that the substantive law of South Dakota governs BNSF's cause of action.

BNSF argues that § 147 and each of the four contacts set forth in § 145(2) of the Restatement demonstrate that Nebraska law should apply. First, BNSF submits that this case "should be governed by Nebraska law because the injury occurred in Nebraska." (Pl.'s Br. at 20, ECF No. 54.) In support of this argument, BNSF claims that "while the derailment technically occurred one mile from the Nebraska border in South Dakota, the 'injury' it gave rise to occurred in Nebraska in the form of various interruption of business losses and the an [sic] overall loss to BNSF which performs a substantial part of its business in Nebraska." (Id.) It adds,

> Nebraska is a much more important state with respect to BNSF's railroad industry than South Dakota, and BNSF has more track, bigger yards and more employees in Nebraska than it does in South Dakota. Since it was formed, BNSF has always conducted a substantial amount of its business in Nebraska. BNSF is one of Nebraska's largest employers, and besides this stimulus to Nebraska's economy, BNSF also donates generously to local charities in Nebraska. BNSF also transports Nebraska's agricultural products into interstate and international commerce. BNSF's presence in South Dakota pales in comparison with its presence in South Dakota, so if the company was injured overall, it is much more logical to say that it was injured in Nebraska where its presence is huge than that it was injured in South Dakota where its presence is negligible.

(Id. at 20-21 (citations omitted).) Although the record does establish that BNSF has a much greater "presence" in Nebraska than in South Dakota, this does not alter the fact that the injury to BNSF's property occurred in South Dakota. Also, BNSF's evidence does not indicate that BNSF suffered "interruption of business losses" in Nebraska. Instead, it shows that "the expenses and costs for the derailment were not exclusively assigned to BNSF operations in South Dakota," but were instead "absorbed by BNSF as a whole, instead of impacting BNSF operating budgets on a local or statewide basis." (Pl.'s Index, Ex. 5, Clem Aff. ¶ 6, ECF No. 55-5.) Thus, I am not persuaded that it is "more logical to say that [BNSF] was injured in Nebraska," given that BNSF's principal place of business is elsewhere and that the loss was not "absorbed" by any one state.

BNSF also argues that "South Dakota itself was not injured by the derailment" because no South Dakota residents were personally injured in the derailment or suffered any property losses, and

13

there were no service interruptions to local South Dakota businesses caused by the derailment." (Pl.'s Br. at 21, ECF No. 54.)  It seems to me, however, that because the derailment occurred in South Dakota, that state retains an important interest in imposing liability for the derailment, or not, in accordance with its own laws.  Furthermore, I note that the amended complaint alleges that BNSF suffered damages to property located in South Dakota and "business interruption costs" due to the derailment.  (Am. Compl. ¶ 15, ECF No. 15.)  I remain persuaded that "the place where the injury occurred" is South Dakota, and therefore § 145(2)(a) and § 147 of the Restatement weigh strongly in favor of the conclusion that South Dakota law should govern BNSF's action.

Turning to the second contact listed in § 145(2) of the Restatement, BNSF argues that "[t]he place where the conduct causing the injury occurred was also in Nebraska."  (Pl.'s Br. at 21, ECF No. 54.)  In support of this argument, BNSF claims that "[t]he conduct that caused the injury was the delivery of a defective product to BNSF" in Nebraska.  (Id. (emphasis added).)  This argument is without merit.  BNSF was injured by a derailment in South Dakota that was allegedly caused by a defective insulated joint manufactured in Indiana.  No conduct that caused BNSF's injury occurred in Nebraska.  Indeed, the fact that the insulated joint was delivered to Nebraska prior to its installation in South Dakota is merely incidental.

Third, BNSF argues that although neither party is incorporated in Nebraska or has its principal place of business there, both are registered to do business in Nebraska.  (Pl.'s Br. at 21-22, ECF No. 54.)  See also Restatement (Second) of Conflict of Laws § 145(2)(c).  It adds that L.B. Foster is not registered to do business in South Dakota and owns no property there.  (Pl.'s Br. at 22.)  I agree with BNSF that this contact favors applying the substantive law of Nebraska, and I have considered it in combination with the other factors that inform my analysis.

Fourth, BNSF argues that "[t]he relationship between L.B. Foster and BNSF, particularly with respect to this particular product (the insulated joint) was centered in Nebraska."  (Pl.'s Br. at 22, ECF No. 54.)  BNSF emphasizes that a BNSF Roadmaster placed the purchase order for the insulated joint in Nebraska; the insulated joint was shipped to Nebraska; and the insulated joint "sat in the Crawford, Nebraska railroad yard for approximately one year before it happened to be taken approximately one mile north of the Nebraska border and installed on a section of track near Ardmore, South Dakota."  (Id. at 22-23.)  It adds that the fact that the "transaction between the

14

parties occurred here in Nebraska" is much more significant than the place of the derailment, which was located in South Dakota "only by sheer happenstance." (Id. at 22.)

In support of this latter point, BNSF refers me to Fanselow v. Rice, 213 F. Supp. 2d 1077, 1088 (D. Neb. 2002).  In Fanselow, the plaintiff sued a trucking company and its driver for personal injuries sustained in an accident that occurred in Nebraska.  The trucking company was incorporated in Minnesota, and at the time of the suit the driver was a citizen of Oregon.  I found that the plaintiff's punitive damages claim against the Minnesota defendant would be governed by Minnesota law and that the punitive damages claim against the Oregon defendant would be governed by Oregon law because those states had significant interests in punishing and/or deterring future wrongdoing by their residents.  Nebraska, in contrast, had no significant interest in prohibiting punitive damages awards against non-resident defendants.  BNSF emphasizes my statement, "Nebraska has little interest in applying its punitive damages laws to a case such as this, where the only connection it has with the defendants is that it was the location of the accident giving rise to the lawsuit," suggesting that a similar finding should be made in this case. (Pl.'s Br. at 23, ECF No. 54 (citing Fanselow, 213 F. Supp. 2d at 1085).)  I am not persuaded.  My holding in Fanselow was based on policy factors relevant to punitive damages that are simply not at issue in this case.  It also merits mention that the accident in Fanselow occurred in Nebraska, and the parties agreed that Nebraska law governed every issue in the case except for punitive damages.  See Fanselow, 213 F. Supp. 2d at 1079.  Thus, Fanselow does not stand for the broad proposition that the site of the accident is not a significant contact for the purposes of a choice-of-law analysis.[8]

It is true that the transaction between L.B. Foster and BNSF bears a connection with Nebraska.  Moreover, the fact that the insulated joint was ordered by a person in and was delivered to Nebraska is a relevant contact for the purposes of my choice-of-law analysis.  It seems to me, however, that the logistics of the transaction are not particularly significant because the ordering,

---

[8] BNSF also refers me to Jones v. Willis Shaw Express, Inc., No. 8:04CV271 (D. Neb. Feb. 28, 2006) (order granting motion to amend complaint), for the proposition that "the law of the state where the accident occurred [does] not control" a choice-of-law analysis. (Pl.'s Br. at 23, ECF No. 54; see also Pl.'s Index, Ex. 1, Sattler Aff. Ex. H.)  Jones relies upon Fanselow to resolve a similar choice-of-law dispute regarding punitive damages, and I find that it, like Fanselow, is inapposite to the case now before me.

shipping, and storage of the insulated joint do not have more than an incidental connection to BNSF's cause of action.  The failure of the insulated joint and the derailment that it caused, are the focus of BNSF's suit.  Thus, I find that the place of the injury has greater relative importance than the fact that the parties' relationship has a connection with Nebraska.

BNSF also argues that the seven factors set forth in § 6(2) of the Restatement (Second) of Conflict of Laws weigh in favor of a finding that this action should be governed by Nebraska's substantive law.  (See Pl.'s Br. at 23-26, ECF No. 54.)  BNSF argues that the first factor, i.e., "the needs of interstate and international systems," "generally means that the choice of law rules 'should seek to further harmonious relations between states and to facilitate commercial intercourse between them.'"  (Id. at 23-24 (quoting Restatement (Second) of Conflicts of Laws § 6, comment d).)  It adds that because "the commercial intercourse between BNSF and L.B. Foster in this case was between Nebraska and [Indiana] . . . it is Nebraska that has the interest in furthering a harmonious relationship with an out-of-state corporation, not South Dakota."  (Id.; see also Pl.'s Supp. Br. at 4, ECF No. 97 (conceding that the joint was manufactured in Indiana rather than Pennsylvania).)  As I noted above, however, the particulars of the business transaction surrounding the sale of the insulated joint are not the focal point of this action.  In other words, the interest in facilitating "commercial intercourse" between Nebraska and Indiana is not a salient factor in this case.

Second, BNSF argues that "the relevant policies of the forum" would be best served if Nebraska law governs the substance of this action because "Nebraska [has] an interest in this litigation beyond simply it being the location for the trial."  (Pl.'s Br. at 24, ECF No. 54.)  It continues, "It was the state where the insulated joint was purchased and delivered, but perhaps even more importantly, Nebraska has a substantial interest in protecting BNSF (which is one of Nebraska's biggest employers, a company that donates nearly half a million dollars to Nebraska charities every year, and a company responsible for supporting Nebraska's agricultural economy through the import and export of its goods)."  (Id.)  I am not drawn to the suggestion that Nebraska has an interest in "protecting" BNSF due to its status in this state, but I agree with BNSF that the delivery of the insulated joint to Nebraska means that Nebraska has an interest in BNSF's economic standing and an interest in this case beyond the mere fact that Nebraska is the place of trial.  BNSF's cause of action does not concern the delivery of the insulated joint to Nebraska, but rather its failure

16

on the track in South Dakota. Thus, I find that this factor, like the first, does not weigh significantly in my analysis.

Regarding the third factor, BNSF argues that "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue" weigh in favor of the application of Nebraska law because "Nebraska has an interest in protecting a company that employs a large number of its citizens, stimulates the local economy . . . and gives back to the community through its donations," while "South Dakota does not have this same interest in protecting L.B. Foster" because "there is no evidence that it is a key economic player there." (Pl.'s Br. at 25, ECF No. 54.) As I noted above, I am not moved by BNSF's theory that the law of the state with the greater interest in protecting a company that performs important, valuable services within its borders should control.

BNSF also refers me to § 6, comment f, of the Restatement, which merits discussion. The comment states, "The content of the relevant local law rule of a state may be significant in determining whether this state is the state with the dominant interest. So, for example, application of a state's statute or common law rule which would absolve the defendant from liability could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff." Restatement (Second) of Conflict of Laws § 6, comment f. It seems to me that neither South Dakota's nor Nebraska's statute of limitations is designed to favor "the welfare of the injured plaintiff," but rather to ensure that defendants are notified of claims against them within a reasonable amount of time. In other words, is the states' interest in protecting defendants against delayed claims, not the "welfare of the injured plaintiff," that is salient here. It also seems to me that South Dakota's three-year statute of limitations for product liability actions does not place an unfair or unreasonable burden on plaintiffs, even though it provides for a shorter window for plaintiffs to act than Nebraska's statute. I find that the policies of the states are sufficiently parallel, and their applicable rules are sufficiently similar, to render the policy differences insignificant in my analysis.[9]

_____

[9] It merits repeating that Nebraska has a specific statute that arguably overrides the "relevant policies" clause of § 6(2)(c) of the Restatement, and BNSF has not argued that this statute is applicable here. See Neb. Rev. Stat. § 25-3205 ("If the court determines that the limitation period of another state applicable under section 25-3203 or 25-3204 is substantially different from the limitation period of this state and has not afforded a fair opportunity to sue

17

On the other hand, I find that South Dakota has a very strong interest in having its rules applied in cases involving injuries that occur to things within its borders. Because South Dakota has a significant interest in the determination of the issues raised in this case, this factor weighs in favor of the application of South Dakota law.

The fourth factor concerns "the protection of justified expectations." Restatement (Second) of Conflict of Laws § 6(2)(d). Genuine issues of material fact prevented me from finding that the Agreement's choice-of-law provision applied to the sale of the insulated joint at issue in this case. Apart from this, there is no indication that either party "justifiably molded [its] conduct to conform to the requirements of another state," or gave thought to the law that would be applied in a product liability action involving an insulated joint. Restatement (Second) of Conflict of Laws § 6, comment g. This factor, therefore, does not inform my analysis.

Fifth, BNSF submits that "the basic policies underlying the particular field of law" favor the application of Nebraska law in this case. Citing § 6, comment h, of the Restatement, BNSF argues that "when the policies of the interested states are largely the same, . . . the court should apply the law of the state that will best achieve that policy." (Pl.'s Br. at 25-26, ECF No. 54.) It adds that because "[t]he policies underlying negligence law do not vary much" between South Dakota and Nebraska," "[t]he basic policy concerns of negligence law would best be achieved by having this case fully and fairly litigated in Nebraska, rather than have it possibly dismissed under another state's statute of limitation where BNSF would not be made whole." (Id. at 26.) In support of its argument, BNSF refers me to FDIC v. Nordbrock, 102 F.3d 335, 339 (8th Cir. 1996), wherein the district court found that Illinois had a more significant relationship to an action for recovery on a promissory note than Nebraska because,

> [The defendant] signed the promissory note as evidence of his indebtedness to an Illinois bank. Pursuant to his promissory note, Nordbrock received funds from an Illinois lender and has agreed to be bound by Illinois law concerning any action on the promissory note. Moreover, Nebraska's policy protecting one of its citizens

---

upon, or imposes an unfair burden in defending against, the claim, the limitation period of this state applies."); Restatement (Second) of Conflict of Laws § 6(1)-(2) (explaining that courts will follow statutory directives of their own states on choice of law, and consider the factors set forth in § 6(2) only when there is no such directive).

18

from "stale" claims is outweighed by Illinois' interest in protecting the assets of its financial institutions.

(citation omitted). The foregoing paragraph shows that a number of factors favored the application of Illinois law; the court's decision did not hinge solely on its finding that the policy underlying the plaintiff's claim outweighed the policy underlying the statute of limitations. It is also significant that the particular field of law at issue in Nordbrock is contract, not product liability. Thus, the court's analysis does not address the significance of the place of injury under § 145 and § 147 of the Restatement. It is fair to say, however, that Nordbrock appears to stand for the proposition that the basic policies underlying the particular field of law at issue in a case outweigh the basic policies underlying statutes of limitation, and that this proposition merits consideration in a choice-of-law analysis. I find, therefore, that the balance between the basic policies underlying product liability law and statutes of limitations weighs in favor the application of Nebraska law in this case.

The sixth factor, which is "certainty, predictability, and uniformity of result," favors the application of the rule that in actions for injury to tangible things, the law of the state where the injury occurred should be applied except "in those relatively rare situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence, the thing, and the parties." Restatement (Second) of Conflict of Laws §§ 6(2)(f) and 147, comment c. Here, the failure of L.B. Foster's insulated joint, BNSF's damaged property, and BNSF itself all have significant connections with South Dakota, but L.B. Foster is not registered to do business in South Dakota. On balance, I find that certainty, predictability, and uniformity of result weighs in favor of the application of South Dakota law in accordance with § 147.

The seventh and final factor concerns the "ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2)(g). This factor is less significant than the other six. See id., comment j. Nevertheless, the determination of the applicable law is made simple by § 147, and it is not difficult to apply the law of the state where the injury occurred (i.e., South Dakota). See id. § 147, comment c ("[S]ince the state where the injury occurred will usually be readily ascertainable, [§ 147 furthers the choice of law value] of ease in the determination and application of the applicable law.").

In summary, the Restatement counsels that in cases like this one, the law of the place where the injury occurred should ordinarily be applied, "subject to only rare exceptions," because states have obvious interests "in regulating the conduct of persons within [their] territory" and in determining liability for injuries that occurred there.  Restatement (Second) of Conflict of Laws § 145, comment d.  See also id. § 147, comment c.  In the instant case, the place where the injury occurred is South Dakota: the insulated joint was installed in South Dakota; it stood in place for over four years in South Dakota; it failed in South Dakota; and its failure caused a derailment that resulted in damages to BNSF's property in South Dakota.  It is clear that South Dakota has the greatest interest in resolving this case in accordance with its laws, and that Nebraska's interest in the determination of L.B. Foster's liability for BNSF's damages is inferior.  Restatement (Second) of Conflict of Laws § 6(2)(c).  Also, applying South Dakota law "furthers the choice-of-law values of certainty, predictability, and uniformity of result and . . . of ease in the determination and application of the applicable law."  Restatement (Second) of Conflict of Laws § 147, comment c (citing Restatement (Second) of Conflict of Laws § 6).

Nebraska, in contrast, was not the place where the injury occurred, nor was it the place where the conduct that caused the injury occurred.  BNSF's action is not wholly without contacts to Nebraska: L.B. Foster and BNSF are both registered to do business in Nebraska, and the insulated joint was ordered by and delivered to a person in Nebraska.  These contacts have no direct relationship with BNSF's cause of action, however.  Although I accept that the basic policy underlying product liability law arguably outweighs the basic policy underlying statutes of limitations, I do not find that this factor is sufficient to support the conclusion that Nebraska has the most significant relationship to the derailment, even when taken in combination with the Nebraska contacts noted above.  In short, this case does not represent one of "those relatively rare situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence, the thing [that was injured], and the parties."  Restatement (Second) of Conflict of Laws § 147, comment c.[10]

---

[10] BNSF argues that this case is analogous to Kabasinskas v. Haskin, No. 8:10CV111, 2011 WL 1897546 (D. Neb. May 18, 2011), especially when that case is considered alongside Fanselow v. Rice, 213 F. Supp 2d 1077, 1085 (D. Neb. 2002), which I have discussed above.  In

Because South Dakota's strong interest in redressing injuries to things within its borders in accordance with its own laws outweighs the contacts with Nebraska and other policy considerations, the substantive law of South Dakota governs BNSF's cause of action.

### C.   The Applicable Statute of Limitations in South Dakota

BNSF argues that even if South Dakota law governs its cause of action, certain claims were filed within the time periods established by South Dakota's various statutes of limitations.  (Pl.'s Br. at 40-42, ECF No. 54.)  BNSF concedes that its negligence and strict liability claims are governed by South Dakota Codified Laws section 15-2-12.2, which imposes a three-year statute of limitations in product liability cases.  (Pl.'s Br. at 19, 35, ECF No. 54.)  Thus, it is clear that L.B. Foster is entitled to summary judgment on those counts.  BNSF submits, however, that under South Dakota law, a six-year statute of limitations governs its negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims, (see Pl.'s Br. at 31, 38-39, 41, ECF No. 54

---

Kabasinskas, the court determined that the law of Nebraska would apply to the issue of punitive damages because "[t]he focal point of the contacts under the facts of this case is Nebraska," adding, "Nebraska is where: the conduct leading to the accident occurred; the accident happened; and, importantly, where USX is registered as a foreign corporation and regularly does business, owns real property, operates a terminal, and employs workers."  2011 WL 18978546, at *6.  Here, in contrast, the conduct leading to the accident did not occur in Nebraska, the accident did not happen in Nebraska, and L.B. Foster's connections with Nebraska are much more limited.  Kabasinskas is therefore readily distinguishable from this case.

BNSF also argues that this case is analogous to Heinze v. Heinze, 742 N.W.2d 465 (Neb. 2007).  In Heinze, the court considered whether to apply Colorado law or Nebraska law in a case involving married Nebraska residents injured in a single car accident in Colorado.  The court noted that "the law of the site of the injury is usually applied to determine liability," but "[t]he fact that Nebraska has a guest statute provides this state with a more significant relationship to the parties when they are residents of Nebraska."  742 N.W.2d at 469.  The court also noted that the parties were both residents of Nebraska at the time of the accident, that their trip to Colorado began in Nebraska and was intended to end in Nebraska, that they lived and worked in Nebraska, that their relationship was centered in Nebraska, and the parties were married at the time of the accident.  Id. at 470.  In addition, the court noted that "in cases involving family members, the state where the parties are domiciled has a more significant relationship to the action and will govern over the law of the state where the tort occurred."  Id.  Like Kabasinskas, Heinze is easily distinguished from the case before me.

(citing S.D. Codified Laws § 15-2-13)); and a four-year statute of limitations applies to its breach of warranty claim, (id. at 36, 41-42 (citing S.D. Codified Laws § 57A-2-725)).

As I noted previously, South Dakota, like Nebraska, defines a product liability action as "[a]n action against a . . . seller of a product, regardless of the substantive legal theory upon which the action is brought, for or on account of . . . property damage caused by or resulting from the manufacture, construction, design, formula, installation, inspection, preparation, assembly, testing, packaging, labeling, or sale of any product or failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product." S.D. Codified Laws § 15-2-12.2. It also states that such actions "may be commenced only within three years of the date when the . . . property damage occurred, became known or should have become known to the injured party." Id. BNSF's cause of action is clearly a product liability action as defined in section 15-2-12.2, and BNSF cannot benefit from longer limitations periods merely by stating different "substantive legal theor[ies]" in its amended complaint. Id. Cf. Berg v. Johnson & Johnson, No. CIV. 09-4179, 2010 WL 3806141 (D.S.D. Sept. 21, 2010) (indicating that plaintiff's strict liability, negligence, breach of warranty, civil conspiracy, acting in concert, and gross negligence claims were product liability claims subject to the limitations period set forth in S.D. Codified Laws § 15-2-12.2); Thach v. Tiger Corp., No. CIV 07-4165, 2009 WL 2058872 (D.S.D. July 13, 2009) (stating that negligence, product and strict liability, and breach of warranty claims were all subject to section 15-2-12.2).

BNSF's product liability action is governed by South Dakota law, and therefore South Dakota's three-year statute of limitations applies to this case. BNSF's action was not commenced "within three years of the date when the . . . property damage occurred, became known or should have became known to" BNSF. S.D. Codified Laws § 15-2-12.2. The action is therefore untimely, and L.B. Foster is entitled to summary judgment on BNSF's claims.

**IT IS ORDERED** that L.B. Foster's motion for summary judgment, (ECF No. 43), is granted.

Dated January 8, 2012.

BY THE COURT

Warren K. Urbom
United States Senior District Judge